UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MIKLEN           SAPSSOV,
individually and on behalf
of   all   others   similarly
situated and NORFOLK COUNTY
RETIREMENT              SYSTEM,
individually and on behalf
of   all   others   similarly
situated,

       Plaintiffs,

v.                                    Case No: 2:12-cv-46-FtM-29DNF
                                                2:12-cv-163-FtM-29DNF

HEALTH            MANAGEMENT
ASSOCIATES,  INC.,  GARY  D.
NEWSOME, KELLY E. CURRY, and
ROBERT E. FARNHAM,

       Defendants.

---

## OPINION AND ORDER

This matter comes before the Court on review of defendant's Motion to Dismiss the Second Amended Consolidated Class Action Complaint (Doc. #59). Plaintiff filed a Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. #63), to which defendants filed a Reply in Support of Their Motion to Dismiss (Doc. #71). Also before the Court is plaintiffs' Motion to Strike (Doc. #64). Defendants filed an Opposition to Plaintiffs' Motion to Strike (Doc. #65), and with leave of the Court, plaintiffs filed a Reply Memorandum in Support of Their Motion to Strike (Doc. #70).

**I.**

Plaintiffs initiated this class action suit against Health Management Associates, Inc. (HMA) and three of its executives, Gary Newsome, Kelly Curry, and Robert Farnham (the "individual defendants," and collectively with HMA, "defendants"), to remedy alleged violations of the Securities Exchange Act of 1934 (the "Exchange Act"). The proposed class is purchasers of the publicly traded common stock of Health Management Associates, Inc. (HMA) between July 27, 2009, and January 9, 2012 (the "Class Period"). Plaintiffs allege that defendants violated Sections 10(b) and 20(a) of the Exchange Act by failing to disclose a purported scheme to defraud Medicare, which resulted in inflated revenue during the Class Period.

Plaintiffs' Second Amended Consolidated Class Action Complaint (the "Complaint") makes the following allegations:

**A.    The Defendants**

HMA, a for-profit corporation headquartered in Naples, Florida, operates acute care hospitals and other health care facilities in non-urban areas throughout the United States. (Doc. #49, ¶ 27.) The individual defendants are current or former directors or officers of HMA. Gary D. Newsome (Newsome) has served as President and Chief Executive Officer (CEO) of HMA since September 15, 2008, and is also a member of the company's Board of Directors. (Id. ¶ 28.) Robert E. Farnham (Farnham) was the Senior

Vice President and Chief Financial Officer (CFO) of HMA from March 2001 through January 10, 2010.  Farnham also served as HMA's Senior Vice President of Finance.  (Id. ¶ 29.)  Kelly E. Curry (Curry) has served as the Vice President and CFO of HMA since January 10, 2010.  (Id. ¶ 30.)

**B.    The Medicare Program**

The Medicare Program provides reimbursement to healthcare providers for medical services rendered to individuals covered by the program.  Most hospitals, including those owned by HMA, derive a substantial portion of their revenue from Medicare and must comply with the requirements of Medicare in order to properly receive reimbursement.  (Id. ¶ 59.)  When a patient suffering from a medical condition seeks treatment at a hospital, physicians have three choices with respect to a patient's disposition: (1) admit the patient to the hospital as an inpatient; (2) admit the patient to the hospital on observation status; and (3) discharge the patient after immediate treatment.  Both inpatient status and observation status place patients in a bed at the hospital, and may include one or more overnight stays.

Inpatient status is generally reserved for patients in need of higher intensity services, while observation status patients require less intensive services or are still in diagnostic stages to determine if inpatient admission will be necessary.  Observation status requires patients to be in the hospital for a minimum of

eight hours and, with a few exceptions, for a maximum of forty-eight hours. (Id. ¶ 60.)  Generally, Medicare beneficiaries are initially admitted to observation status in order to evaluate their condition fully and to determine if inpatient admission is required. (Id. ¶ 69.)  Medicare reimbursement for inpatient services is based upon Diagnosis Related Groups (DRGs) and the patient's diagnosis. Reimbursement for inpatient services is substantially greater than reimbursement for observation services. (Id. ¶ 65.) Hospitals, however, may only be reimbursed for treatment that is "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A); (Doc. #49, ¶ 71.)

## C.   Defendants' Scheme to Defraud Medicare

Prior to the start of the Class Period, HMA was a highly leveraged company facing declining admissions. (Id. ¶ 74.) Following the resignation of HMA's former CEO, the Board of Directors selected Newsome as the company's new President and CEO. (Id. ¶ 78.)  In order to facilitate improved financial performance at HMA, Newsome told investors that HMA would focus on three operational initiatives: (1) the Emergency Department; (2) physician recruitment and development; and (3) market service development. (Id. ¶ 78.)  These three initiatives became defendants' public mantra and were touted in defendants' public statements throughout the Class Period. (Id. ¶ 79.)  Plaintiffs allege that defendants crafted a corporate policy mandating the

4

admission of Medicare patients to HMA hospitals, even when
unnecessary, in order to artificially boost HMA's financial
results, and correspondingly, its stock price.  HMA admitted
patients to observation status when they did not need to be
admitted at all, and to inpatient status when they should have
been admitted to observation status.  (Doc. #49, ¶ 84.)

    **(1)**    **Sources of Information**

The description of the fraudulent scheme alleged by
plaintiffs is based on publicly available news articles and
reports, public filings, securities analysts' reports and
advisories about HMA, interviews of former HMA employees, press
releases and other public statements issued by HMA, and media
reports about HMA.  (Id. ¶ 38.)  Among the former employees
interviewed, nineteen appear in the Complaint as confidential
witnesses (CWs).  The allegations regarding the confidential
witnesses are as follows:

- CW 1 was employed as a Resource Manager at the Dallas Regional
  Medical Center in Mesquite, Texas from March 2010 until CW 1
  resigned in April 2011.  CW 1 was tasked with utilization
  review and discharge planning, and reported to Nancy Alford
  (Alford), Dallas Regional's Director of Case Management.  CW
  1 provided information regarding HMA's mandate to convert
  patients in observation status to inpatient status.  (Id. ¶
  40.)

- Alford, formally identified as CW 2, worked for HMA from February 2010 through June 30, 2010. She managed and organized the nursing department personnel and conducted hiring, firing, training, and counseling to the nurses who reported to her. Alford reported to Linda Broome, the Chief Nursing Officer, who reported to Dallas Regional CEO Justin Davis. Alford provided plaintiffs with information regarding the conversion of patients to inpatient status even though the patients did not meet the criteria for inpatient status. (Id. ¶ 41.)

- CW 3 served as the Health Information Management Coding Supervisor at two HMA hospitals in Florida. CW 3 reported directly to Health Information Management Supervisor Diana Spaulding, who reported to the hospital's CFO. The main responsibility of CW 3 was coding treatments provided to patients and auditing coding charges. CW 3 provided information concerning the improper coding of patients as inpatient. (Id. ¶ 42.)

- CW 4 was a Registered Nurse in the Emergency Room at Dallas Regional from May 2002 through January 2012. CW 4 was responsible for preparing admissions and caring for patients, as well as storing, purchasing, and restocking Emergency Department supplies. This witness provided information

regarding HMA's mandate to increase inpatient admissions. (Id. ¶ 43.)

- CW 5 was a Registered Nurse at Stringfellow Memorial Hospital in Anniston, Alabama, and provided information concerning the improper conversion of patients in observations status to inpatient status. (Id. ¶ 44.)

- CW 6 was a Trauma Medic at Dallas Regional from September 2009 until October 2011. CW 6 provided information similar to that provided by CW 5. (Id. ¶ 45.)

- CW 7 was employed by HMA as a hospital CFO for approximately six years. CW 7 was responsible for financial reporting, materials management, information technology, accounting, and oversight of the hospital medical records and Medicare billing. CW 7 reported directly to the hospital CEO, but had indirect reporting responsibility to Vice President of Operations Finance Mark Spafford, who reported to the Division President, Josh Putter. CW 7 provided information regarding HMA's aggressive approach to admitting patients to the hospital regardless of medical necessity. (Id. ¶ 46.)

- CW 8 worked as physician in the Emergency Department at the Sandhills Regional Medical Center in Hamlet, North Carolina from 1997 to 2010. CW 8 provided information about the pressure from HMA corporate to admit Medicare patients in the

Emergency Department to the hospital whenever possible.  (Id. ¶ 47.)

- CW 9 worked as a nurse in the Emergency Department at Sandhills Regional until retiring in July of 2011.  CW 9 provided information regarding the pressure put on physicians to increase admissions, which began near the end of 2009. (Id. ¶ 48.)

- CW 10, a physician in the Emergency Department at Dallas Regional, provided information regarding the pressure upon physicians and nurses by hospital administrators to increase admissions as well as the focus on admitting patients over the age of 65.  (Id. ¶ 49.)

- CW 11 was a Registered Nurse at the Twin Rivers Ridgeville Hospital in Kent, Missouri from 2002 until February 2011.  CW 11 provided information regarding the push to inappropriately admit Emergency Department patients.  (Id. ¶ 50.)

- CW 12 was a Case Manager at Physicians Regional Medical Center in Naples, Florida from August 2009 through March 2010.  CW 12 was responsible for updating patient status and preparing surveys for state regulators.  This witness provided information regarding the improper admission patients as inpatients as well as the termination of HMA employees who complained about the inappropriate admissions practices. (Id. ¶ 51.)

- CW 13 was an Assistant Director of Medical Surgery/Operating Room at Shands Starke Regional Medical Center from April 2008 until November 2010.  Shands Regional was acquired by HMA in or around July 2010.  CW 13 provided information about the change in admission policy and improper admission of patients in the Emergency Department following HMA's acquisition of the hospital.  (Id. ¶ 52.)

- CW 14 worked at the Barrow Regional Medical Center in Winder, Georgia from October 2007 to June 2011.  CW 14 was responsible for running the medical staff office, including oversight of the physicians and nurses employed by the hospital.  CW 14 provided information regarding the improper admission of patients.  (Id. ¶ 53.)

- CW 15 was a Registered Nurse a Barrow Regional and provided information regarding the improper admission of patients.  (Id. ¶ 54.)

- CW 16 was a hospitalist at Barrow Regional and provided information concerning HMA's mandate to inappropriately admit patients whenever possible.  (Id. ¶ 55.)

- CW 17 was a hospitalist as Clearview Regional Medical Center in Monroe, Georgia and provided information regarding the pressure HMA put on physicians to admit patients even when

not medically necessary, as well as the manipulation of patient diagnoses in order to boost admissions. (Id. ¶ 56.)

- CW 18 was the Emergency Department Director at Jamestown Regional Medical Center in Jamestown, Tennessee. CW 18 was responsible for overseeing the operations of the Emergency Department and reported the hospital CEO and Director of Nurses. CW 18 provided information regarding admission quotas, the pressure to admit patients, and the improper admission of patients. (Id. ¶ 57.)

- Finally, CW 19, the Director of Health Information Management at Barrow Regional from July 2009 until September 2011, was responsible for confirming that patient charges matched their DRG and coding charges. CW 19 told plaintiffs about the inappropriate admission of patients at HMA hospitals and the submission of bills to Medicare for the inappropriately admitted patients. (Id. ¶ 58.)

**(2)   Corporate Policy Mandating Admissions**

In order to increase admissions at HMA hospitals, a corporate policy was implemented that suddenly changed how admissions generated through the Emergency Department were handled. This involved a number of changes throughout HMA.

**(a)   Upgrade of the Pro-MED Software**

One of the first steps taken in the implementation of the corporate policy was the upgrade of HMA's Pro-MED software,

completed by the end of the first quarter of 2009.  Pro-MED has been described as a system to control physicians and increase patient admissions by ordering an extensive battery of tests-many of which were unnecessary-as soon as the patient walked into the emergency room.  (Id. ¶ 83.)  The system also intervened with a physician's medical decision to send a patient home by stating "Qual Check" with an accompanying warning declaring that "this patient meets criteria for admission.  Do you want to override?" (Id. ¶ 194.)  HMA management predicted at the Cowen & Company Healthcare Conference on March 16, 2009, that "the improvements that [HMA will] get from this [Pro-MED] initiative will increase [Emergency Department] admit rates, over time." (Id. ¶ 82.)  Scott Rankin, a former HMA physician, stated that Pro-MED had "nothing to with patient safety and patient care.  It has everything to do with generating revenues." (Id.)

Once the upgrade was complete, HMA became "aggressively involved" in training Emergency Department physicians, clinical staff, and hospital CEOs throughout the organization.  (Id.) Through the aggressive training of physicians and the pressure to increase admissions, HMA was able to manipulate the Pro-MED system by ensuring that physicians would enter data that would enable the system to recommend that the patient be admitted as an inpatient.

### (b)   Increased Focus on Medicare Patients

The changes to the admission procedures in the Emergency Department went into effect near the end of 2009. The changes included an increased amount of pressure on physicians by hospital administrators to admit more patients, and an increased focus on patients over the age of 65 because payment was guaranteed by Medicare. The majority of improperly admitted Medicare patients were potential cardiac patients who arrived at the Emergency Department complaining of chest pain or asthmatics. CW 6 stated that cardiac patients complaining of chest pain or shortness of breath were frequently admitted as inappropriate observation patients and were considered "automatic overnights." (Id. ¶ 86.) A number of the confidential witnesses stated that the inappropriate conversion of Medicare patients to observation or inpatient status occurred multiple times a day. (Id. ¶ 89.)

HMA enforced a top-down, mandated policy of increasing inpatient admissions regardless of medical necessity. Both CW 1 and Alford stated that HMA was focused on decreasing observation numbers and increasing inpatient numbers in order to bill Medicare at the more expensive inpatient rates. CW 19 stated that she/he received letters demonstrating that Medicare was billed for inappropriate patient admissions or procedures. CW19 was responsible for investigating why the patients were considered inappropriate for admission, and stated that many of the

inappropriately admitted patients were patients who complained of chest pain and were given various tests, such as blood tests and x-rays, which came back negative. (Id. ¶ 91.) CW 5 also stated that cardiac patients with normal test results were often admitted to observation or inpatient status in order to "boost up" the hospital's census. (Id. ¶ 92.) Similarly, Alford stated that in January and February 2010, 70-80% of 1-day inpatient stays did not meet inpatient criteria, and a majority of the patients would normally receive an outpatient procedure, but were kept overnight to be billed as an inpatient. (Id. ¶ 93.)

CW 1 provided plaintiffs with a specific example of HMA's improper and unnecessary admission of Medicare patients that occurred on or around February 21, 2011. CW 1 stated that a dialysis patient, who was healthy enough to live at home and carry out day-to-day activities, was referred to the Emergency Department from a dialysis center that discovered her/his graft was clotted. The patient, who was on Medicare, was admitted to inpatient status with a clotted AV graft, but the procedure could have been performed on an outpatient basis and the highest status used should have been observation. (Id. ¶ 95.)

In addition to improperly admitting patients who arrived through the Emergency Department, HMA also improperly admitted patients who arrived at the hospital for scheduled visits. CW 3 stated that approximately five patients per week who were scheduled

for procedures at the hospital were incorrectly scheduled as inpatients instead of outpatients.  According to CW 3, angioplasty patients admitted as inpatients often left the hospital the same day or within 24 hours of admission, just as outpatients did.  The patients were coded as inpatients, however, because the Health Information Management department and physicians stated that the status was determined based on the type of care, not the amount of time the patient spent in the hospital.  CW 3 believes that the physicians' definition of inpatient status would not meet the Medicare guidelines.  (Id. ¶ 101.)

### (c)   **Flash Meetings and Increased Pressure to Admit Patients**

During the Class Period, physicians were pressured to improperly admit patients and to meet admission quotas set by HMA's corporate office.  (Id. ¶ 118.)  In order to bolster admissions, physicians were encouraged to increase testing in order to find reasons to admit patients.  For instance, CW 8 stated that HMA initiated daily meetings at the end of 2009 in which the records from the previous day were reviewed with the goal of finding patients whom the administrators believed should have been admitted to the hospital.  CW 8 also stated that the administrators were unhappy when the admission rate fell below 20-22% on a single day and would put pressure on the physicians to keep admissions up.  (Id. ¶ 119.)  Some of the other confidential witnesses

provided plaintiffs with similar statements.  It was also stated that in order to maintain the established quota the number of improper admissions would increase if the admission was rate was low.  According to CW 14, this policy came directly from Chris Hilton, the Vice President of Operations Finance for HMA.  (Id. ¶ 126.)

Division President Josh Putter (Putter) disclosed the use of "flash meetings" during an analyst meeting on March 25, 2010.  The flash meetings, which included the hospital CEO, the physician on duty, the CNO, the CFO, the head of the emergency department, and anyone else that was deemed necessary, utilized a report generated by the Pro-MED software to discuss the discharge of patients.  Plaintiffs allege that the meetings were primarily used to discuss how the number of patients in observation status could be decreased and how the number of admissions could be increased.  (Id. ¶¶ 131-32.)  During the meetings, some of the confidential witnesses were informed that "corporate did not like observations" and that there was corporate pressure to increase inpatient admissions.  (Id. ¶ 133.)  CW 10 stated that he was required to review all the cases in the Emergency Department with hospital administrators and provide detailed explanations to justify why patients were discharged against the decision of the Pro-MED software.  CW 10 further stated that the CEO at Dallas Regional wanted the hospital admission rate to be 22%, but CW 10 stated that this admission

rate could not be achieved legally.  (Id. ¶ 138.)  As an example
of HMA's corporate mandated pressure to meet admissions quotas,
Alford stated that she received daily emails from Dallas Regional's
Division President insisting that a patient who had been under
observation for 4-5 days be admitted as an inpatient.  According
to Alford, the patient was discharged on the same day that an email
was sent insisting that the patient be admitted.  (Id. ¶ 142.)

    Additional evidence of HMA's mandated pressure came from
Jeffery Hamby (Hamby).  Hamby, formerly a physician at the Summit
Medical Center in Arkansas, filed an action against HMA for
wrongful termination based on his failure to meet HMA's admission
goals.  (Id. ¶ 22.)  Hamby alleged in the action that HMA used the
Pro-MED software to monitor physicians' admission rates and to
pressure physicians to admit more patients, and physicians who
failed to meet their admission numbers were subject to
embarrassment at the flash meetings.  Hamby further alleged that
HMA would print a list of emergency patients who were sent home
against Pro-MED's recommendation, and then require an explanation
from the physician as to why the patient was discharged.  (Id. ¶
140.)

    In addition to the daily flash meetings, HMA sent daily
reports to every HMA hospital.  The reports contained patient
observation information, including the number of observations
versus inpatient admissions, as well as patient account numbers

and bill rates.  Patients that had been in observation for twenty-four hours were flagged in yellow on the report and CW 1 stated that she/he provided corporate with a report after every meeting indicating whether a patient was still in observation.  (Id. ¶ 145.)

### (d)  HMA Hires Accretive Health

Accretive Health describes itself as a provider of services that help healthcare providers generate sustainable improvements in their operating margins and healthcare quality while also improving patient, physician, and staff satisfaction.  In or around May or June of 2011, HMA hired Accretive Health to review patient information and to put pressure on physicians to admit observation patients into the hospital as inpatients.  According to CW 7, the directive to send cases to Accretive Health came directly from HMA's CFO and CEO in response to a rise in the number of observation cases at HMA hospitals.  This service cost approximately $210 for every file reviewed.  (Id. ¶ 166.)

Early on, HMA employees were unsure of which files should be sent to Accretive Health.  In response to this confusion, CW 7 decided that a patient's file should not be sent to Accretive Health if the patient could be converted to inpatient status.  As a result, HMA determined that only the files of Medicare patients and possible surgery patients who were not admitted as inpatients should be sent to Accretive Health for review.  (Id. ¶¶ 46, 168.)

17

It is also alleged that HMA hired a competitor of Accretive Health to determine who converted more observation cases into inpatient cases.  (Id. ¶ 170.)

**D.   Reports of Improper Patient Admissions Ignored by HMA**

Paul Meyer (Meyer), former agent with the Federal Bureau of Investigation (FBI) and former Director of Compliance, was tasked with auditing certain HMA hospitals for compliance with applicable federal and state laws and internal policies.  Meyer was also responsible for working with those hospitals to develop corrective action plans to ensure compliance.  (Id. ¶ 147.)  In January 2010, Meyer began monitoring certain HMA hospitals and uncovered serious compliance issues involving Medicare billing practices.  In the first half of 2010, Meyer warned HMA that several hospitals secured higher government payments from the Medicare program for the elderly and disabled by fraudulently billing Medicare for patients that were improperly admitted as inpatients.

Meyer continued to visit the HMA hospitals for which he had oversight responsibility and determined that the fraudulent billing practices were ongoing in an "open, notorious and widespread" manner.  (Id. ¶ 149.)  After his compliance concerns went unaddressed and uncorrected by HMA, Meyer advised his supervisor in August 2010 that he was going to prepare a detailed memorandum for review by HMA's top management and Board of Directors.  Meyer's supervisor directed him to involve HMA's in-

house legal counsel in the matter, and Meyer was directed to water-down the memorandum.  Meyer was also prohibited from listing HMA's CEO as recipient of the memorandum, and was specifically instructed by HMA's general counsel to destroy his drafts (although Meyer did not do so).  (Id. ¶¶ 148-49.)  Meyer submitted the memorandum to his supervisor, Matt Tormey (Tormey), on August 19, 2010.  Tormey, as HMA's Vice President of Compliance and Security, had a direct reporting line to the Board of Directors and the CEO.  (Id. ¶ 151.) Meyer also reported the fraudulent billing practices directly to Newsome.  (Id. ¶ 152.)

Instead of addressing the concerns raised in the memorandum, HMA immediately took steps to remove Meyer's oversight responsibilities at the hospitals identified in the memorandum and eventually changed his job responsibilities altogether.  On September 6, 2011, Meyer sent HMA an email stating "[I]t is my intent that the right thing be done in this investigation."  (Id. ¶ 153.)  Meyer was fired later that day.  On October 19, 2011, Meyer filed a whistleblower action against HMA (the "Meyer action").  (Id. ¶ 154.)

**E.   HMA Employees Terminated for Reporting or Complaining About Fraudulent Billing Practices**

According to plaintiffs, other HMA employees were terminated for reporting or complaining about the fraudulent billing practices.  CW 4 stated that the nurses who complained to

physicians about the number of patients admitted were terminated. Similarly, CW 6 stated that Emergency Department physicians who refused to increase the average length of stay at the hospital were replaced.  (Id. ¶¶ 162-63.)   CW 16 stated that she/he was admonished whenever she/he pushed back on inappropriate admissions and that "people feared losing their jobs" for not complying with HMA's admissions policies.

Alford was also terminated by HMA after changing admission procedures to increase the number of patients in observation. According to Alford, Dallas Regional only had two observation patients out of 130 beds when she started, even though the national average was between 15%-20%.   The increase in the number of patients in observation, however, caused trouble with the senior management at Dallas Regional.  Alford was told that she terminated for failing to accomplish a task, but she believes the reason for her termination was her refusal to decrease patients in observation numbers.  (Id. ¶¶ 164-65.)

**F.   Other Evidence of Fraud**

**(1)   The 60 Minutes Segment**

On December 2, 2012, CBS aired a segment on 60 Minutes entitled "Hospitals: The Cost of Admission" focusing on HMA's admission and billing practices.  60 Minutes interviewed more than a hundred current and former employees who provided details demonstrating that HMA pressured its physicians and staff to admit

patients who should not have been admitted in order to generate higher Medicare revenue, set quotas for admissions that could not be met in the absence of fraud, and customized its Pro-MED computer system in order to justify the improper admission of more patients. (Id. ¶ 20.)  The segment also linked the admission policies directly to Newsome through the testimony of John Vollmer (Vollmer), a former Executive Vice President at HMA.  (Id. ¶ 197.)

    **(2)  The CtW Letters**

On November 16, 2011, Richard W. Clayton III, the Research Director at the CtW Investment Group (CtW), sent a letter to Kent P. Dauten, the Chairman of HMA's Audit Committee, stating that CtW's calculations suggested that HMA's admission rates were far exceeding those that could be explained by patient acuity or hospital geography.  (Id. ¶ 103.)  The gist of the letter was that most of HMA's hospitals were exceeding the expected admission rates calculated by CtW.  CtW estimated that the excess admissions generated $40 million in excess Medicare billing in 2009 alone, or roughly 25% of the net income for the year.  The letter further detailed CtW's calculations and concerns regarding the admission and billing practices at HMA hospitals.

CtW also sent a letter on January 17, 2012, detailing its concerns regarding the revelation of the Meyer action and how Meyer's allegations dovetail with its findings. (Id. ¶¶ 103-04.)

### (3)   The CRT Report

On December 3, 2012, the day after the 60 Minutes segment aired, the CRT Capital Group LLC (CRT) published a 161 page report (the CRT Report) detailing how admission rates changed dramatically after Newsome took over as HMA's CEO.  (Id. ¶ 112.) The report compared HMA hospitals over the 2006 to 2010 period to comparable local competitors in the same state and concluded that HMA had a high number of short stays and a low observation rate. (Id. ¶ 113.)  CRT also stated that "[w]e have connected the dots between the troubling admit patterns and profits at the local HMA hospitals at PERCISELY the same time, i.e., in the period AFTER management changed at HMA."  (Doc. #49-2, p. 2.)

## G.   Defendants' False and Misleading Statements

Plaintiffs allege that defendants made more than thirty false and misleading statements during the Class Period.  Plaintiffs claim that the identified statements were false and misleading because HMA's growth was caused by a scheme to defraud Medicare, not the implementation of the initiatives identified by Newsome; HMA's success could not be explained by the factors disclosed to the market; defendants knew HMA was not in compliance with Medicare regulations; and HMA's financial reporting throughout the class period was made in violations of Generally Accepted Accounting Principles (GAAP).  (Id. ¶ 223.)

**H.    Revelation of the Fraudulent Scheme**

Plaintiffs assert that the fraudulent conduct stands in stark contrast to the statements defendants made during the Class Period and caused HMA's common stock to trade at an artificially inflated rate.  Once the truth was learned about the fraudulent conduct, the share price dramatically declined causing the members of the proposed class to suffer significant losses and damages.  (Id. ¶ 19.)

Plaintiffs allege that the truth about the positive financial results and admission practices were revealed to the market through two partial disclosures.  (Doc. #49, ¶ 11.)  The first disclosure began on August 3, 2011, when HMA revealed that it received two subpoenas from the U.S. Department of Health and Human Services, Office of Inspector General (OIG).  The subpoenas sought, among other things, information regarding HMA's "Emergency Department management including the use of Pro-MED software."  (Id. ¶ 12.) Following the disclosure of the subpoenas, two Wall Street analysts downgraded HMA stock and the price of HMA common stock declined by 9.12%.  (Id. ¶ 13.)  On October 25, 2011, HMA revealed in its Form 10-Q that the subpoenas might be related to violations of the Anti-Kickback Statute and the False Claims Act (FCA) and could have been prompted by a whistle-blower complaint.   HMA, however, withheld the details regarding the whistle-blower complaint, and

continued to mislead the market by failing to reveal the company-wide scheme to defraud Medicare.  (Id. ¶ 14.)

The second disclosure occurred on January 9, 2012, when equity analyst Sheryl Skolnick of CRT provided the market with details regarding the Meyer action.  (Id. ¶ 15.)  Following the revelation of this information, the price of HMA common stock declined by more than 7%, with an abnormally large amount of shares traded. (Id. ¶ 16.)  On January 10, 2012, HMA disclosed that Timothy R. Parry, Esq., Senior Vice President, General Counsel, and Secretary of the Company, had abruptly announced his intention to resign, effective immediately.  (Id. ¶ 17.)  That same day, the stock fell an additional 13% with more than 68 million shares traded.  (Id. ¶ 18.)

## II.

### A.   Statutory Elements

Plaintiffs allege that HMA and the three individual defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by failing to disclose the fraudulent scheme used to increase Medicare revenue.  Section 10(b) of the Exchange Act makes it unlawful to

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 forbids

> any person, directly or indirectly . . .
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In order state a claim for securities fraud under these provisions, a plaintiff must adequately allege:  (1) a material misrepresentation or omission; (2) scienter-a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance; (5) economic loss;  and  (6)  a  causal  connection  between  the  material misrepresentation or omission and the loss, commonly called "loss causation."  Meyer v. Greene, 710 F.3d 1189, 1194 (11th Cir. 2013) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

Plaintiffs also claim that the individual defendants are liable under §20(a) of the Exchange Act.  Section 20(a) provides:

> Every person who directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or

indirectly induce the act or acts constituting the
violation or cause of action.

15 U.S.C. § 78t(a). This statute "imposes derivative liability on
persons that control primary violators of the Act." Laperriere v.
Vesta Ins. Grp., Inc., 526 F.3d 715, 721 (11th Cir. 2008) (per
curiam). In order to state a claim under § 20(a), plaintiffs must
allege that (1) HMA committed a primary violation of the Exchange
Act; (2) the individual defendants had the power to control the
general business affairs of HMA; and (3) that the individual
defendants "had the requisite power to directly or indirectly
control or influence specific corporate policy which resulted in
the primary violation." Mizzaro v. Home Depot, Inc., 544 F.3d
1230, 1237 (11th Cir. 2008) (quoting Theoharous v. Fong, 256 F.3d
1219, 1227 (11th Cir. 2001)). Thus, plaintiffs may only state a
claim under § 20(a) if they adequately plead a violation of § 10(b)
and Rule 10b-5.

## B.   Pleading Requirements

### (1)   General Requirements

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint
must contain a "short and plain statement of the claim showing
that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).
This obligation "requires more than labels and conclusions, and a
formulaic recitation of the elements of a cause of action will not
do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)

(citation omitted).  To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level."  Id. at 555.  See also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010).  This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible."  Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks and citations omitted).  Thus, a court reviewing a complaint on a Rule 12(b)(6) motion must accept the well-pleaded factual allegations as true and "then determine whether they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679.  This analysis is limited primarily to the face of the complaint and attachments

thereto; however, "a court may consider documents attached to the motion to dismiss if they are referred to in the complaint and are central to the plaintiff's claim." Starship Enters. of Atlanta, Inc. v. Coweta Cnty, Ga., 708 F.3d 1243, 1252 n.13 (11th Cir. 2013) (citing Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1368-69 (11th Cir. 1997)).

### (2)  Fed. R. Civ. P. 9(b)

A claim for security fraud is subject to the heightened pleading requirements of Rule 9(b), which requires a complaint "to state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); Mizzaro, 544 F.3d at 1237. "The particularity requirement of Rule 9(b) is satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" United States ex rel. Matheny v. Medco Health Solutions, Inc., 671 F.3d 1217, 1222 (11th Cir. 2012) (quoting Hopper v. Solvay Pharms., Inc., 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotation marks and citations omitted)). Thus, it is sufficient to plead the who, what, when, where, and how of the allegedly false statements. Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (citations omitted).

### (3)   Private Securities Litigation Reform Act of 1995

"As a check against abusive litigation by private parties," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007), Congress imposed additional pleading requirements with the enactment of the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 194-67, 109 Stat. 737 (1995).  For Rule 10b-5 claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  "And for all private Rule 10b-5 actions requiring proof of scienter, 'the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter].'"  FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir. 2011) (citing 15 U.S.C. § 78u-4(b)(2)).  The complaint must also allege facts supporting a strong inference of scienter "for each defendant with respect to each violation."  Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004).

**III.**

Defendants seek dismissal of the Complaint on the grounds that plaintiffs have failed to:  (1) allege the underlying fraud with the requisite particularity;  (2) plead facts showing a material misrepresentation or omission;  (3) plead facts showing scienter; and  (4) plead loss causation.  The Court addresses each in turn.

**A.   Pleading Fraud with Particularity**

Defendants assert that plaintiffs must allege a claim under the False Claims Act (FCA) in order to plausibly allege that defendants committed Medicare fraud, but have failed to do so.  To state a claim under the FCA, a plaintiff must allege (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, by the defendant to the United State for payment or approval, (3) with knowledge that the claim was false.  United States _ex rel_. Walker v. R & F Props. of Lake Cnty, Inc., 433 F.3d 1349, 1355 (11th Cir. 2005) (citing 31 U.S.C. § 3279(a)).  Plaintiffs respond that there is no legal basis for requiring a plaintiff in a § 10(b) case to satisfy the pleading requirements of the FCA.

Defendants have not cited any authority for the proposition that a claim for securities fraud premised on an underlying scheme to defraud Medicare must comply with the pleading requirements for a FCA claim, and the Court has not found any.  The Court finds

that plaintiffs in this case need not allege a violation of the FCA in order to properly plead their securities fraud cause of action.

Defendants further argue that the allegations in the Complaint do not plausibly suggest that Medicare fraud was occurring at HMA hospitals. Defendants assert that the allegations from the Meyer action have been discredited; the CRT Report actually controverts plaintiffs' allegations; the assertions based on the 60 Minutes segment are contradicted by testimony and the CRT Report; the allegations regarding the Pro-MED software do not create a plausible inference of fraud; the confidential witnesses do not provide direct or circumstantial evidence of fraud; and the CtW letters do not establish fraud.  In support of their position, defendants submitted a plethora of exhibits that they claim contradict the allegations in the Complaint.  Defendants' arguments also rely on credibility determinations it wants the Court to make regarding the witnesses identified in the Complaint. For example, defendants seek to discredit most of the confidential witnesses by asserting that non-physicians are unable to determine whether a patient should be admitted, and thus the statements made by non-physicians regarding the improper admission of patients should not be considered.

The Court is required to accept the factual allegations in a complaint as true when considering a motion to dismiss, and is

unable to make the credibility determinations defendants urge. After an extensive review of the Complaint and defendants' arguments, the Court finds that the factual allegations, when accepted as true, plausibly state with the requisite particularity the securities fraud claims.

## B.  Material Misrepresentations or Omissions

Defendants also contend that the Complaint should be dismissed because it fails to plead sufficient facts showing that a false and misleading statement was made.  Specifically, defendants assert that they had no duty to speculate about Medicare fraud; that HMA accurately reported its historic financial results; that expressions of belief and forward looking statements are immunized from liability by the safe harbor provision of the PSLRA; and that vague, optimistic forward-looking statements are not actionable.  Plaintiffs respond that they have adequately identified each of the false or misleading statements, including who made the statement, when and where the statement was made, and have adequately explained how each statement was false in light of the Medicare fraud occurring at HMA hospitals.

The Court finds that plaintiffs have sufficiently plead the false and misleading statements.  Given the sheer number of statements identified in the Complaint, the Court will use the statements made by Newsome at the UBS Global Healthcare Services Conference on February 28, 2010, to illustrate the sufficiency of

the allegations.    In discussing HMA's Emergency Department, Newsome stated as follows:

> **This is key for us, because it is the front door of the hospital. HMA, like most of the industry, 50%, 60%, 70% of the admissions come through the emergency room.  And I can't overemphasize how critical this is in driving business into our hospitals and doing it the right way. It is the absolute right thing to do for all the right reasons, because it reduces risk.**  As these patients come into our hospitals there are processes that we have in place.

> **We have a more appropriate disposition whether the patient is discharged, admitted or transferred appropriately,** and obviously improved quality and patient satisfaction.  **This is critical as we look at the emergency room initiative as we go forward.**

>                             . . .

> Through the third quarter of September 30 of 2009 emergency room visits and in quarter 12.9%, and year-to-date 5.1%.   Needless to say outstanding results. **Admissions generally throughout the facilities in the third quarter are 5.4%, and year-to-date through the third quarter of 9/30/09, 3.4% growth.**

> **We have led the peer group for four consecutive quarters in admissions growth.  And this is truly as a result of our emergency room initiatives first, to a lesser extent, our physician recruitment, because it takes time, and then the market service development.  The next area -- well adjusted admissions first, 7% growth in the third quarter and 3.9% overall for the year through the third quarter.**

(Doc. #49, ¶ 246.)  Plaintiffs provide a laundry list of reasons why the bolded part of the passage was false and misleading, the most important being that HMA led the peer group in admissions because of the fraudulent admission of Medicare patients, not the success of the Emergency Department initiatives.

Defendants assert that HMA had no duty to accuse itself of wrongdoing, and thus the failure to disclose the suspicions of wrongdoing does not make a statement false or misleading.  Although defendants do not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if they put "the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of the success, since reasonable investors would find that such information would significantly alter the mix of available information."  In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013).  Because Newsome put the source of HMA's success at issue, the alleged failure to disclose the true source of this revenue could give rise to liability under § 10(b).  The Court finds that plaintiffs have sufficiently alleged that defendants made false and misleading statements.  Defendants' arguments to the contrary are rejected.

## C.   Scienter

In order to survive a motion to dismiss, a complaint must allege facts sufficiently demonstrating each defendant's state of mind regarding the alleged violations.  Phillips, 374 F.3d at 1018.  In the Eleventh Circuit, "scienter consists of intent to defraud or severe recklessness on the part of the defendant."  Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 790 (11th Cir. 2010).  Severe recklessness is "limited to those

highly unreasonable omissions or misrepresentations" involving "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Mizzaro, 544 F.3d at 1238 (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)). A motive and opportunity to commit fraud, without more, cannot establish scienter. Bryant, 187 F.3d at 1285-86.

As previously noted, the PSLRA explicitly requires that the complaint's allegations create "a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. This requires the court to view the allegations collectively, not in isolation. Id. at 326. The court must also engage in a comparative analysis of the allegations, which requires consideration of "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 324. It is worth noting that "this test is not the same as the standard [courts] employ for summary judgment under Fed. R. Civ. P. 56, because it asks what a reasonable person *would* think, not what a reasonable person *could* think." Mizzaro, 544 F.3d at 1239.

Plaintiffs' allegations of scienter are premised on their belief that defendants "implemented and oversaw" a scheme to defraud Medicare. (Doc. #49, ¶ 6.) Plaintiffs attempt to create a strong inference of scienter through allegations of the aggressive admission policies initiated by Newsome, the individual defendants' heavy involvement in daily operations, the upgrade of the Pro-MED software, the use of Accretive Health, the amount and widespread nature of the fraud, the allegations in the Meyer action, and the investigation by the OIG. The Court finds that the allegations, when viewed holistically, create a strong inference of scienter. The motion to dismiss on this ground is denied.

**D.   Loss Causation**

Finally, defendants assert that the Complaint should dismissed because plaintiffs have failed to adequately plead loss causation. Loss causation requires plaintiffs to plead, and ultimately prove, a causal connection between the misrepresentation and the investment's subsequent decline in value. Meyer, 710 F.3d at 1195. One way of showing loss causation is referred to as the fraud-on-the-market theory, upon which plaintiffs primarily rely.

**(1)   The Fraud-on-the-Market Theory in § 10(b) Claims**

Fraud-on-the-market claims derive from the efficient market hypothesis, which provides that "in an open and developed

securities market, the price of a company's stock is determined by the available material information regarding the company and its business." FindWhat, 658 F.3d at 1309-10 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 241 (1988)).  Because the market price of shares traded on well-developed markets reflects all publicly available information, including any material misrepresentations, there is a presumption "that an investor relies on public misstatements whenever he buys or sells stock at the price set by the market." Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2185 (2011) (internal quotation marks omitted).  "A 'fraud on the market' occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market." FindWhat, 658 F.3d at 1310. (citing Basic, 485 U.S. at 247).

A corollary of this theory is that the disclosure of information already known by the market, commonly referred to as confirmatory information, will not cause a change in stock price because that information has already been digested by the market and incorporated into the stock price.  FindWhat, 658 F.3d at 1310. The publicly disseminated falsehood will then be incorporated into the market price of the stock, resulting in artificial inflation. Id.  If the falsehood remains uncorrected, it will continue to taint the total mix of public information and, as a result, the market will continue to attribute the artificial inflation to the stock.  Id.  "If and when the misinformation is finally corrected

by the release of truthful information (often called a 'corrective disclosure'), the market will recalibrate the stock price to account for this change in information, eliminating whatever artificial value it had attributed to the price. That is, the inflation within the stock price will 'dissipate.'" Id. Fraud-on-the-market theory in class action security fraud cases creates a rebuttable presumption of reliance, so long as the misstatement was material and the market was informationally efficient. Id. (citing Basic, 485 U.S. at 247).

A showing that plaintiffs bought the security at a price that was artificially inflated by the fraudulent misrepresentation is not enough. Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 725 (11th Cir. 2012) (citing Dura, 544 U.S. at 338). Thus, the plaintiffs in a fraud-on-the-market case "must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.'" Id. (citing FindWhat, 658 F.3d at 1311).

In fraud-on-the-market cases, plaintiffs often demonstrate loss causation circumstantially, by: (1) identifying a corrective disclosure; (2) showing that the price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer

that it is more probable than not that it was the corrective disclosure-as opposed to other possible depressive factors-that caused at least a substantial amount of price drop.  Meyer, 710 F.3d at 1196-97 (citing FindWhat, 658 F.3d at 1311-12).  In order to be corrective, "a disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company."  Id. at 1197 (citing In re Williams Sec. Litig. - WCG Subclass, 558 F.3d 1130, 1140 (10th Cir. 2009)).  A plaintiff need not rely on a single corrective disclosure revealing the truth, rather, it is possible to show that the truth was revealed "through a series of partial disclosures."  Id. (citing Lormand v. US Unwired, Inc., 565 F.3d 228, 261 (5th Cir. 2009)).  "Regardless of the theory upon which it is based, 'loss causation analysis in a fraud-on-the-market case focuses on the following question: even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?'"  Id. (quoting FindWhat, 658 F.3d at 1312).

Here, plaintiffs allege that they are entitled to presumption of reliance under the fraud-on-the-market doctrine because "the market for HMA common stock promptly digested current information regarding HMA from all publicly available sources and reflected such information in the price of HMA stock."  (Doc. #49, ¶¶ 372-

73.)  Plaintiffs allege that the fraudulent scheme behind HMA's financials and future prospects was revealed in the two partial disclosures discussed earlier.  Defendants assert that the Complaint should dismissed because the disclosures identified do not amount to corrective disclosures.

In order to constitute a corrective disclosure, the disclosure must "reveal[] to the market the falsity of [a] prior misstatement[]." FindWhat, 658 F.3d at 1311 n.28.  The Eleventh Circuit has held that "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b).  The announcement of an investigation reveals just that-an investigation-and nothing more." Meyer, 710 F.3d at 1201.  Upon the announcement of an investigation, the price of stock may fall because the investigation can be seen to portend an added risk of future corrective action.  It cannot be said, however, that the investigation, in and of itself, reveals to the market that a company's previous statements were false or fraudulent. Id.  Thus, the announcement of an investigation, standing alone or without the subsequent disclosure of actual wrongdoing, cannot qualify as a corrective disclosure.  "It is, after all, impossible to say that an SEC investigation was the moment when the 'relevant truth beg[an] to leak out' if the truth never actually leaked out." Id. at 1201 n.13 (quoting Dura, 544 U.S. at 342).

Plaintiffs allege that the disclosure of the government subpoenas on August 3, 2011, was the first partial revelation of the truth because it revealed the nature of defendants' undisclosed scheme. As a result of the disclosure, two Wall Street analysts downgraded HMA stock, with one issuing a report entitled "How Can We Believe You Now, HMA? Failure to Disclose July OIG Pro-MED Subpoena with Earnings Crushes Our Confidence." (Doc. #49, ¶ 382.) It is further alleged that the disclosure of the investigation indicated that two of HMA's three critical corporate strategies were now the subject of regulatory scrutiny. (Id.) However, the revelation of the investigation by the OIG, standing alone, does not reveal any actual wrongdoing, and therefore does not qualify as a corrective disclosure.

Plaintiffs contend, however, that the misstatements and omissions were revealed in earnest when a security analyst informed the market of the specific details regarding the Meyer action. Plaintiffs contend that the report constitutes a corrective disclosure because defendants failed to disclose the lawsuit prior to the release of the report. Defendants disagree, arguing that the report prepared by Skolnick of CRT does not qualify as a corrective disclosure because it is merely a summarization of information that had been public since October, 19, 2011.

Plaintiffs' argument fails for two reasons. First, plaintiffs' contention disregards the efficient market hypothesis

that they rely on to establish reliance.  It is assumed under the efficient market hypothesis that the stock price reflects all publicly available information; thus, the mere repackaging of information obtained from a public docket by an analyst is simply insufficient to constitute a corrective disclosure and is indeed fatal to plaintiffs' claims.  See Meyer, 710 F.3d at 1199.  "In the financial markets, not every bit of bad news that has a negative effect on the price of a security necessarily has a corrective effect for purposes of loss causation."  Id. at 1202.

Second, the allegations in the Meyer complaint, like the revelation of the OIG investigation, do not reveal the falsity of a prior statement.  The filing of a civil complaint certainly does not establish that the defendant committed or is liable for the conduct alleged.  This is reflected by the January 17, 2012, letter from the CtW to Dauten.  In discussing the Meyer action, CtW stated that "[a]s shareholders, we are in no position to assess these allegations . . . ."  (Doc. #49-5, p. 3.)  Furthermore, the Meyer complaint alleges that fraudulent billing was only occurring at four HMA hospitals.  (Doc. #49, ¶ 154.)  According to the 60 Minute segment, HMA owns 70 hospitals; thus, the revelation that fraudulent billing may be occurring at four of them hardly reflects the companywide fraud that plaintiffs claim the disclosures revealed.  (Doc. #49-1, p. 2.)

Plaintiffs also turn to the 60 Minutes segment as other evidence disclosing the fraud. The 60 Minutes segment, however, aired nearly eleven months after the close of the Class Period. Such a large temporal lapse removes the segment from the realm of relevance in determining loss causation.[1]

**(2)  Materialization of the Concealed Risk**

In response to defendants' motion to dismiss, plaintiffs also make a brief reference to the "materialization of the concealed risk" theory of loss causation. The Eleventh Circuit "has never decided whether the materialization-of-concealed-risk theory may be used to prove loss causation in a fraud-on-the-market case," but the Court will address it nonetheless. Hubbard, 688 F.3d at 726 n.25. Under the materialization-of-concealed-risk theory, a plaintiff must allege that the loss was foreseeable and that the loss was caused by the materialization of the concealed risk. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d. Cir. 2005). When evaluating the materialization of the risk, a court asks whether "the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e. that the misstatement or omission concealed something from the market that, when

---

[1]Although it holds little relevance, it is interesting to note that the price of HMA stock quickly recovered after the 60 Minutes segment aired and the release of the CRT Report. On April 1, 2013, HMA common stock was valued at $13.24, a price that exceeded the price of HMA stock during the Class Period.

disclosed, negatively affected the value of the security." <u>Id.</u> (internal citations omitted).

Here, plaintiffs assert HMA's corporate policy of increasing admissions in violation of Medicare guidelines "created a risk that those practices would be exposed and created the risk that when HMA was no longer able to bill fraudulently, HMA's financials and future business prospects would be compromised. So when the fraudulent practices were exposed by HMA's director of compliance and by the OIG investigations, those previously undisclosed risks materialized, and shareholder losses were the result." (Doc. #63, p. 55.) The purpose of securities fraud litigation is not to provide shareholders with an insurance policy covering losses resulting from the disclosure of an investigation or information regarding the possibility of fraud, but to protect them against economic losses that are actually caused by the misrepresentation. See <u>Dura</u>, 544 U.S. at 345. Although the price of HMA common stock dropped in reaction to statements regarding the possibility of fraud, there was not a materialization of the risk; therefore, defendants' motion to dismiss is granted.

## IV.

In addition to their claim under § 10(b) of the Exchange Act, plaintiffs assert a §20(a) control-person claim. Because a primary violation of the securities law constitutes an essential element of a § 20(a) derivative claim, a plaintiff adequately pleads a §

20(a) claim only where the plaintiff adequately pleads a primary violation.   _Mizzaro_, 544 F.3d at 1237.   As discussed above, plaintiffs have failed to adequately plead a violation of § 10(b); therefore, plaintiffs have failed adequately plead a § 20(a) control-person claim.

## V.

In response to defendants' motion to dismiss, plaintiffs filed a motion to strike exhibits 1-4, 8-9, 12-14, 19, 21, 23-24, and 29-30 attached to defendants' motion to dismiss.   Because the Court did not rely on any of the identified exhibits in ruling on defendants' motion, plaintiffs' motion to strike is denied as moot.

## VI.

At the conclusion of their response in opposition, plaintiffs request that they be granted leave to replead their claims should the Court grant defendants' motion.   Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court "should freely give leave [to amend] when justice so requires."   Fed. R. Civ. P. 15(a)(2).   However, "justice does not require district courts to waste their time on hopeless cases," therefore, leave may be denied if a proposed amendment fails to correct the deficiencies in the original complaint or otherwise fails to state a claim.   _Mizzaro_, 544 F.3d at 1255 (citing _Foman v. Davis_, 371 U.S. 178, 182 (1962)). Here, plaintiffs are currently proceeding on their third complaint and had the benefit of reviewing many of the arguments raised in

defendants' motion to dismiss before filing the operative pleading. Due to the absence of loss causation, the request for leave to amend will be denied.

Accordingly, it is now

**ORDERED**:

1. Defendant's Motion to Dismiss the Second Amended Consolidated Class Action Complaint (Doc. #59) is **GRANTED** and the Second Amended Class Action Complaint for Violations of the Federal Securities Laws is **dismissed.**

2. Plaintiffs' Motion to Strike (Doc. #64) is **DENIED AS MOOT**.

3. The Clerk is directed to enter judgment accordingly, terminate all pending motions and deadlines, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __21st__ day of May, 2014.

_____
JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

Copies:

Counsel of record